## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| MARK FREY, individually and on behalf of all others similarly situated, | Case No.   24-cv-3360 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>**JURY TRIAL DEMANDED**</u> |
| AMERIPRISE FINANCIAL, INC.; AMERIPRISE FINANCIAL SERVICES, LLC; AMERIPRISE FINANCIAL SERVICES, INC.; and AMERICAN ENTERPRISE INVESTMENT SERVICES, INC., | |
| Defendants. | |

## TABLE OF CONTENTS

I.     NATURE OF ACTION ...................................................................................... 1

II.    PARTIES ........................................................................................................... 2

III.   JURISDICTION AND VENUE ....................................................................... 3

IV.    FACTUAL ALLEGATIONS ............................................................................ 3

    A.     BACKGROUND ON CASH SWEEP ACCOUNTS ......................................... 3

    B.     AMERIPRISE'S DUTIES TO PLAINTIFF AND CLASS MEMBERS ......... 10

        1.    Contractual Duties ................................................................................ 10

        2.    Duties Imposed on Ameriprise by Law ................................................ 11

    C.     AMERIPRISE BREACHED ITS CONTRACTUAL DUTIES TO ITS
        CUSTOMERS ................................................................................................ 12

    D.     PLAINTIFF'S EXPERIENCE ........................................................................ 14

V.     CLASS ACTION ALLEGATIONS ................................................................ 15

VI.    CAUSES OF ACTION .................................................................................... 18

PRAYER FOR RELIEF ............................................................................................ 25

DEMAND FOR JURY TRIAL .................................................................................. 25

Plaintiff Mark Frey, individually and on behalf of all others similarly situated, alleges the following based on his personal experience and his counsel's investigation:

## I.      NATURE OF ACTION

1.      Plaintiff brings this proposed class action suit against Defendants Ameriprise Financial, Inc.; Ameriprise Financial Services, LLC; Ameriprise Financial Services, Inc.; and American Enterprise Investment Services (collectively, "Ameriprise") based on Ameriprise's actions and conduct with respect to the cash sweep program it operates.

2.      Ameriprise recommends to retail and investment customers who have uninvested cash that they hold such money in what is known as a "cash sweep account" where they can earn interest. The cash sweep accounts at issue in this case are the Ameriprise Insured Money Market Account and the Ameriprise Bank Insured Sweep Account (collectively, "Ameriprise Sweep Program"). Plaintiff and Class members are clients with Ameriprise whose uninvested cash was automatically transferred into cash sweep accounts pursuant to the Ameriprise Sweep Program.

3.      At all relevant times, Ameriprise had a legal and contractual duty to act in the best interests of Plaintiff and the proposed Class members. Unfortunately for Plaintiff and Class members, Ameriprise breached its legal and contractual duties to them. Ameriprise automatically deposited Plaintiff and Class members' uninvested cash with banks (both affiliated and unaffiliated) that pay low and unreasonable rates of return to Ameriprise's investment customers, but paid Ameriprise significant and higher fees at the expense of customers. As a result, Ameriprise was able to generate massive revenues while paying customers a pittance.

4.     Plaintiff alleges that Ameriprise's conduct was unlawful, as described in further detail below, and alleges on behalf of himself and all others similarly situated claims for breach of fiduciary duty, breach of contract, gross negligence, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Plaintiff seeks all available monetary and equitable relief, including damages, disgorgement, restitution, and all other appropriate relief.

## II.     PARTIES

5.     Plaintiff Mark Frey is a resident and citizen of Rancho Palo Verdes, California.

6.     Defendant Ameriprise Financial, Inc. is headquartered in Minneapolis, Minnesota and incorporated in Delaware. It is ranked 245th on the Fortune 500. Through its subsidiaries, Ameriprise Financial, Inc. provides financial planning products and services in the United States, including wealth and asset management, among other things.

7.     Defendant Ameriprise Financial Services, LLC, a subsidiary of Ameriprise Financial, is headquartered in Minneapolis, Minnesota and is a Delaware limited liability company. It is both a registered broker-dealer and investment adviser.

8.     Defendant Ameriprise Financial Services, Inc., a subsidiary of Ameriprise Financial, Inc., is headquartered in Minneapolis, Minnesota and is incorporated in Delaware. It is both a registered broker dealer and investment adviser.

9.     Defendant American Enterprise Investment Services, Inc., a subsidiary of Ameriprise Financial, Inc., is also headquartered in Minneapolis, Minnesota and is incorporated in Delaware.

### III.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which one or more members of the proposed Class, including Plaintiff, are citizens of a state different from Defendants. The Court has supplemental jurisdiction over the alleged state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

11.    This Court may exercise jurisdiction over Defendants because they headquartered in this District; have sufficient minimum contacts in District; and intentionally avail themselves of the markets within this District through the promotion, sale, and marketing of their services, thus rendering the exercise of jurisdiction by this Court proper and necessary.

12.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims emanated from this District.

### IV.    FACTUAL ALLEGATIONS

#### A.    Background on Cash Sweep Accounts

13.    A "cash sweep" or "sweep" account is typically linked to a brokerage account and holds uninvested money, such as the initial cash deposits with Ameriprise before the cash is invested in a security, or cash customers prefer to remain uninvested. The

uninvested cash is "swept" into an interest-bearing account to ensure that the cash is not sitting idly not generating income.

14.     Today, cash sweep programs work by automatically "sweeping" uninvested cash each day into one or more banks that are usually affiliated with the brokerage firm. Historically, uninvested client cash sat with brokerage firms on their balance sheets, but in the 1960s, brokerage firms started depositing the cash with banks in the form of certificates of deposit. In early 2000, Merrill Lynch began offering the type of sweep accounts or programs that are available today and later other brokerage firms, like Charles Schwab, did the same.

15.     The Security and Exchanges Commission ("SEC") defines a sweep program as a "service provided by a broker or dealer where it offers to its customers the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product . . . or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." 17 C.F.R. 240.15c3-3(a)(17).

16.     The amount of uninvested client cash that brokerage firms hold is around $1 trillion dollars. Regarding Ameriprise, in January 2024, it reportedly had cash sweeps and certificates totaling $44.5 billion for 2023. In the second quarter of 2024, Ameriprise reported $81.9 billion total in cash sweeps, money market funds, and brokered CDs, with cash balances slightly down to $40.6 billion.

17.     Brokerage firms and affiliate banks earn significant net interest income (or "spread")—that is, the difference between the rate of interest earned by (1) custodians loaning and investing the sweep deposits, and (2) the interest paid to brokerage customers.

18.     The amounts that brokerage firms earn under sweep programs are based on their agreements with the affiliated banks. The agreements generally provide compensation based on the average daily deposits at the affiliated banks, and the total compensation is generally based on the Federal Funds rate plus basis points.

19.     For some time, Federal Fund rates—the interest rate at which banks lend each other money and which is set by the Federal Open Market Committee—were low and so it was expected that earned interest on cash sweeps would be low if not zero. But in 2022, however, the Federal Funds rate increased considerably as the following chart shows:

| YEAR | AVE. YIELD | YEAR HIGH | YEAR LOW | YEAR CLOSE | ANNUAL % CHANGE |
|------|-----------|-----------|----------|------------|-----------------|
| 2024 | 5.33% | 5.33% | 5.33% | 5.33% | 0.00% |
| 2023 | 5.03% | 5.33% | 4.33% | 5.33% | 23.09% |
| 2022 | 1.68% | 4.33% | 0.08% | 4.33% | 6085.71% |

20.     When the Federal Fund rate rose beginning in 2022, banks increased yields and so brokerages should have been able to negotiate higher rates of return on uninvested cash from affiliated banks. Unfortunately, that has not been the case with some firms such as Ameriprise. Instead, Ameriprise places sweep deposits with affiliated banks that it negotiates with to pay less than reasonable interest rates to customers and more money for itself.

21.     The SEC has stepped up its investigations into brokerage cash sweep programs. For example, according to a Wells Fargo & Co filing in November 2023, the company disclosed that the SEC "has undertaken an investigation regarding the cash sweep options that the company provides to investment advisory clients at account opening."

Morgan Stanley reported a similar investigation in a quarterly earnings report: "Since April 2024, the firm has been engaged with and is responding to requests for information from the Enforcement Division of the SEC regarding advisory account cash balances swept to affiliate bank deposit programs and compliance with the Investment Advisers Act of 1940[.]"

22.     As described in Part C below, brokerage firms owe legal and contractual duties to act in the best interest of their customers, including with respect to their clients' uninvested cash holdings.

### B.     Defendants' Cash Sweep Program

23.     By default, Ameriprise primarily assigns its customers to one of two different cash sweep programs based on the type of account the customer has. The first program is the Ameriprise Insured Money Market Account ("AIMMA") for balances up to $2.5 million (or $5 million for joint accounts) and the second program is the Ameriprise Bank Insured Sweep Account ("ABISA") for balances up to $250,000 (collectively referred to as the "Ameriprise Sweep Program"). All non-qualified accounts and qualified IRA accounts are enrolled automatically in AIMMA, while certain qualified, discretionary accounts are automatically enrolled in ABISA.

24.     Under the Ameriprise Sweep Program, uninvested cash balances will automatically sweep daily into interest bearing deposit accounts set by Ameriprise following the day of deposit and with the banks selected by Ameriprise. The banks that participate in AIMMA are set forth on Ameriprise's "Bank List," which Ameriprise may

modify at any given time. One of the primary institutions on Ameriprise's Bank List is its affiliate, Ameriprise Bank, FSB.

25.     The terms of the Ameriprise Sweep Program are set forth in the Ameriprise Brokerage Client Agreement and a document titled, "Other Important Brokerage Disclosures," (together "Brokerage Agreement"). The Brokerage Agreement provides that uninvested cash balances in the Ameriprise Sweep Program will have interest rates that are "tiered and will vary based on prevailing economic and business conditions, as well as the amounts you have on deposit []."

26.     The deposit accounts in the Ameriprise Sweep Program have very low rates of return. Throughout 2022 and at least through April 2023, the interest rates paid to customers with cash sweep deposits were paltry: from .0% to approximately .30%. The chart below shows examples of Ameriprise's rates in 2023:

| Cash balance | Rate Effective 1/30/23 | APY Effective 1/30/23 | Rate Effective 2/6/23 | APY Effective 2/6/23 |
|---|---|---|---|---|
| $5,000-$24,999.99 | 0.25% | 0.25% | 0.25% | 0.25% |
| $25,000-$49,999.99 | 0.25% | 0.25% | 0.25% | 0.25% |
| $50,000-$99,999.99 | 0.25% | 0.25% | 0.25% | 0.25% |
| $100,000-$249,999.99 | 0.45% | 0.45% | 0.45% | 0.45% |
| $250,000-$499,999.99 | 0.60% | 0.60% | 0.60% | 0.60% |
| $500,000-$999,999.99 | .075% | 0.75% | 0.75% | 0.75% |
| $1,000,000-$4,999,999.99 | 1.73% | 1.75% | 1.73% | 1.75% |
| $5,000,000+ | 1.98% | 2.00% | 1.98% | 2.00% |

27.    While Ameriprise customers have earned low rates of return on their uninvested case, in contrast, Ameriprise has earned significant net interest income from its cash sweep program. Ameriprise's net income for the twelve months ending June 30, 2024, was $3.068 billion, and its annual net income for 2023 was $2.556 billion.

28.    Ameriprise has been able to earn massive revenues because it places its interests above those of Plaintiff and Class members by depositing cash sweep deposits with affiliated banks that pay little interest to customers and pays larger fees and interest to itself and the affiliated banks. Moreover, Ameriprise negotiated these arrangements with the affiliated banks. There are no provisions in the Brokerage Agreement, however, that allow Ameriprise to place its financial interests above its customers' best interests in this manner.

29.     In April 2023, FinancialPlanning reported on conflicts of interests arising from cash sweep programs and posed the following questions to Ameriprise and other brokerage firms:

a.     In terms of percentage points or basis points, what are the latest available figures for the yields to clients from sweep accounts and the yields to the firm?

b.     How would the firm explain this line of business to clients asking how it's in their best interest?

c.     How can financial advisors using your firm's brokerage and/or custodial services make use of higher-yield cash solutions for their clients?

d.     What else should financial advisors know about your firm's cash sweep accounts?

30.     Ameriprise did not provide answers to FinancialPlanning or that could be publicly shared.

31.     While Ameriprise customers received artificially and unreasonably low rates, Ameriprise received a larger share of the spread at its customers' expense. Had Ameriprise obtained reasonable rates for its customers like other brokerages, however, it would have earned less. Ameriprise put its financial interests ahead of that of its customers instead and was able to handsomely line its pockets with massive revenues.

32.     In failing to obtain reasonable rates for its customers, Ameriprise breached its contractual and fiduciary obligations to its customers, as alleged and described herein.

C.    **Ameriprise's Duties to Plaintiff and Class Members**

### 1. Contractual Duties

33.    In operating its cash sweep program, Ameriprise agreed to act as an agent on behalf of its advisory clients and therefore owed them fiduciary duties. The Brokerage Agreement states that "AEIS, as your agent, will establish the Deposit Accounts for you at each Bank and make deposits and withdrawals from the Deposit Accounts." Thus, in establishing the cash sweep program, Ameriprise had to put the best interests of its customers first over its own interests and deposit the uninvested balances in banks that paid reasonable interest rates.

34.    Moreover, Ameriprise acknowledges in the Brokerage Agreement that the Regulation Best Interest ("Reg. BI") governs the scope of Ameriprise's relationship with Plaintiff and Class members. Reg. BI applies to retail investors, i.e., natural persons, or their legal representatives, who receive recommendations primarily for personal, family, or household purposes. 17 C.F.R. § 240.15l-1(b)(1).

35.    Pursuant to Reg. BI, in its role as a broker-dealer, Ameriprise is required to act in its clients' best interests when it makes recommendations to them, "without placing the financial or other interest of the broker-dealer ahead of the interests of the retail customer[.]"

36.    As its customers' agent and pursuant to its contractual obligations, Ameriprise was required to act in their best interests and not put its own personal gain ahead of its clients.

37.    In failing to negotiate higher and reasonable rates for its customers during

the operation of its cash sweep program, Ameriprise breached its contractual duties to customers.

## 2.  Duties Imposed on Ameriprise by Law

38.     In acting as an investment adviser for an actively managed client account, Ameriprise owes its clients, including Plaintiff, a fiduciary duty under federal law. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR § 276 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.").

39.     Pursuant to these regulations, Ameriprise was obligated to "serve the best interest of its client and not subordinate its client's interests to its own." *Id.* And Ameriprise cannot "place its own interests ahead of the interests of its client." *Id.* Ameriprise customers are also owed a duty of care, and Ameriprise is required to use its skills and expertise for the benefit of its clients.

40.     Ameriprise owes a similar duty of care to its retail clients pursuant Reg. BI, 17 C.F.R. § 240.15l-1. Again, Ameriprise acknowledges in the Brokerage Agreement that the Reg. BI governs the scope of Ameriprise's relationship with Plaintiff and Class members.

41.     Like SEC conduct rules, Reg. BI also requires Ameriprise to "act in the retail customer's best interest and cannot place its own interests ahead of its customer's interests." 84 Fed. Reg. 33318, 33320.

42.     Reg. BI "draw[s] on key principles underlying fiduciary obligations, including those that apply to investment advisers under the Advisers Act, while providing

specific requirements to address certain aspects of the relationships between broker-dealers and their retail clients." 84 Fed. Reg. 33318, 33320 (July 12, 2019).

43.     Additionally, for retirement accounts—discretionary or non-discretionary—under 26 U.S.C. § 4975(d)(4), the investment of a retirement plan's full or partial cash assets in deposits must "bear a reasonable interest rate in a bank or similar financial institution," otherwise the deposit of uninvested cash from a retirement account into the Ameriprise Sweep Program would be a prohibited transaction under Section 4975 of the Internal Revenue Code. This requirement ensures that transactions involving retirement accounts by related parties such as those between a plan sponsor like Ameriprise and affiliated banks are made at fair market rates.

44.     As described and alleged herein, Ameriprise failed to abide by its fiduciary duties and in the best interest of its customers as set forth under federal law.

**D.     Ameriprise Breached Its Legal and Contractual Duties to Its Customers**

45.     Ameriprise breached its fiduciary and contractual duties by failing to negotiate higher reasonable interest rates for its customers' deposits in operating the Ameriprise Sweep Program.

46.     Through its contractual and legal duties, Ameriprise is obligated to act in the best interest of its clients consistent with the Brokerage Agreement. Ameriprise's practice of extracting excessive fees from its customers' cash sweep deposits, through the negotiation of unreasonably low interest rates with affiliated banks, was against its customers' interests.

47.    Ameriprise did not negotiate higher and reasonable rates of interest for its customers' cash sweep deposits, but instead it worked in consultation with its affiliated bank partners to set artificially and unreasonably low interest rates.

48.    The Department of Labor defined a "reasonable" rate of interest in 2003 and suggested one way of determining a "reasonable" rate is to refer to rates "offered by other banks" or by "money market funds."[1]

49.    Compared to its competitors, the Ameriprise Sweep Program's interest rates are substantially lower than similar sweep products offered by other financial institutions.

50.    The rates of four of Ameriprise's competitors are in the table below:

| Ameriprise Competitor | Cash Sweep Interest Rate |
|---|---|
| Interactive Brokers[2] | 4.83% |
| MooMoo[3] | 5.1% |
| Vanguard[4] | 4.5% |
| Webull[5] | 5.0% |

51.    Not only are Ameriprise's interest rates significantly lower than its competitors, but they are also substantially lower than interest rates for money market fund rates.

---

[1] 68 Fed. Reg. 34646, at 34648 (June 10, 2003)
[2] https://www.interactivebrokers.com/en/accounts/fees/pricing-interest-rates.php (last accessed August 7, 2024).
[3] https://www.moomoo.com/us/invest/cashsweep (last accessed August 7, 2024).
[4] https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last accessed August 7, 2024).
[5] https://www.webull.com/cash-management (last accessed August 7, 2024).

52.    Many of Ameriprise's competitors offer programs that sweep uninvested cash into money market funds where their customers receive substantially higher returns on their cash.

53.    For example, Ameriprise competitor Fidelity offers a program that sweeps uninvested cash into money market funds that earn approximately 5%.[6] Vanguard's sweep program offers money market funds as an option as well, with yield rates also around 5%.[7] But Ameriprise automatically places customers into the cash sweep programs it has developed with low yield rates that it negotiated with its affiliated banks.

54.    By negotiating substantially lower rates for the cash sweep programs it automatically placed Plaintiff and Class members into, Ameriprise did not act in its customers best interests but put its own interests above theirs, making substantial net income revenue at its customers' expense.

### D.    Plaintiff's Experience

55.    Plaintiff Frey has advisory retirement and traditional brokerage accounts with Ameriprise and has been an Ameriprise customer since 2003. Ameriprise automatically enrolled Plaintiff Frey in the AIMMA, and so for years has automatically swept his uninvested cash into the affiliated banks that Ameriprise selects in its discretion at rates ranging from 0% to .30%, which Ameriprise negotiated for its benefit pursuant to the Ameriprise Sweep Program.

---

[6] https://www.fidelity.com/go/manage-cash-rising-costs (last accessed August 8, 2024).
[7] https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account and https://investor.vanguard.com/investment-products/money-markets (last accessed August 8, 2024).

## V.    CLASS ACTION ALLEGATIONS

56.    Plaintiff brings this action individually and on behalf of all other persons

similarly situated (the "Nationwide Class") pursuant to the Federal Rule of Civil Procedure

23(b)(2), (b)(3), and (c)(4) initially defined as follows:

> All persons who had cash deposits or balances in the Ameriprise
> Sweep Program.

57.    The Nationwide Class is referred to herein as "Class."

58.    Excluded from the proposed Class are Defendants, any entity in which

Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by

Defendants, as well as the officers, directors, affiliates, legal representatives, heirs,

predecessors, successors, and assigns of Defendants; and judicial officers to whom this

case is assigned and their immediate family members.

59.    Plaintiff reserves the right to re-define the Class definition after conducting

discovery.

60.    **Numerosity (Fed. R. Civ. P. 23(a)(1))**. The Class members are so numerous

that joinder of all members is impracticable. The precise number of Class members and

their identities are unknown to Plaintiff currently. However, Ameriprise reportedly has

more than two million individual, business, and institutional clients.[8] The parties will be

able to identify Class members and the exact size of the Class through discovery and

Defendants' records.

---

[8] *See https://www.ameriprise.com/about/our-company* (last visited Aug. 16, 2024).

61.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3))**. Common questions of law and fact exist for each of the claims and predominate over questions affecting only individual members of the Class. Questions common include, but are not limited to, the following:

a.  Whether Defendants owed fiduciary duties to Plaintiff and Class members in the operation of the Ameriprise Sweep Program;

b.  Whether Defendants breached its fiduciary duties to Plaintiff and Class members in the operation of the Ameriprise Sweep Program;

c.  Whether Defendants breached the contract with Plaintiff and Class members in the operation of the Ameriprise Sweep Program;

d.  Whether Defendants' interest rates paid to Plaintiff and Class members were reasonable;

e.  Whether the fees Defendants collected from the Ameriprise Sweep Program were unreasonable;

f.  Whether Defendants breached the implied covenant of good faith and fair dealing;

g.  Whether Defendants are liable for gross negligence to Plaintiff and Class members in the operation of the Ameriprise Sweep Program;

h.  Whether Defendants have been unjustly enriched because of the conduct complained of herein; and

i.  Whether Plaintiff and Class members are entitled to relief, including damages and equitable relief.

62.     **Typicality (Fed. R. Civ. P. 23(a)(3))**. Pursuant to Rule 23(a)(3), Plaintiff's claims are typical of the claims of the Class members. Plaintiff, like all Class members, was paid an unreasonable interest rate in connection with the Ameriprise Sweep Program. Accordingly, Plaintiff's claims are typical of other Class member's claims because they arise from the same course of conduct by Defendants, and the relief sought is common to Class members.

63.     **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**. Pursuant to Rule 23(a)(4), Plaintiff and his counsel will fairly and adequately protect the interests of the Class. Plaintiff has no interest antagonistic to, or in conflict with, the interests of the Class members. Plaintiff has retained counsel experienced in prosecuting class actions and breach of fiduciary cases.

64.     **Superiority (Fed. R. Civ. P. 23(b)(3))**. Pursuant to Rule 23(b)(3), a class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Class members because the amount of monetary relief available to individual plaintiffs is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

65. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)).** In the alternative, this action may properly be maintained as a class action, because:

    a.   the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Defendants; or

    b.   the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

    c.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

66. **Issue Certification (Fed. R. Civ. P. 23(c)(4))**. In the alternative, the common questions of fact and law, set forth in Paragraph 61, are appropriate for issue certification on behalf of the proposed Class.

## VI. CAUSES OF ACTION

### COUNT I
### BREACH OF FIDUCIARY DUTY

67.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

68.     Defendants owed fiduciary duties to Plaintiff and Class members arising out the Brokerage Agreement, Regulation Best Interest, and 84 Fed. Reg. 134, 17 C.F.R. § 276. Defendants' fiduciary duties arose out of Defendants' recommendations made to Plaintiff and Class members via automatic enrollment of Plaintiff and Class members into the Ameriprise Sweep Program and from Defendants' contractual obligation to serve as Plaintiff and Class members' agent under the Brokerage Agreement, including Defendants' holding and control over uninvested cash that belonged to its clients, such as Plaintiff and Class members.

69.     In connection with the operation of the Ameriprise Sweep Program and the governing Brokerage Agreement, Defendants owed duties to Plaintiff and Class members who had advisory, traditional and retirement brokerage accounts. Defendants' duties to Plaintiff and Class members, include, but are not limited to: (a) a duty of care to act in their best interests; (b) a duty to not place Defendants' interests above Plaintiff's and Class members; (c) a duty to use reasonable diligence, care, and skill when making recommendations; (d) a duty to avoid conflicts of interest; and (e) a duty to disclose conflicts of interests.

70.     Defendants breached their duties to Plaintiff and Class members by, among other things: (a) failing to act in their best interests, which was to negotiate and pay a higher and reasonable interest rate on Plaintiff and Class members' cash balances; (b)  placing their own interests ahead of Plaintiff and Class members' interests by securing increased

net interest income for themselves at the expense of Plaintiff and Class members; (c) failing to use reasonable diligence, care, and skill when operating the Ameriprise Sweep Program; (d) failing to avoid or mitigate conflicts of interests; and (e) failing to disclose Defendants' conflict of interest.

71.    As a direct and proximate result of Defendants' misconduct as alleged herein, Plaintiff and Class members suffered damages in that they did not earn higher and reasonable rates of interests, in amounts to be determined at trial. Plaintiff seeks damages, disgorgement of any undue and unjust gains of Defendants, punitive damages, as well as all other equitable relief deemed just and proper.

72.    Defendants' conduct also warrants a punitive damage award because Defendants are guilty of oppression and engaged in conduct that is outrageous and exhibited reckless indifference to the rights of its clients, including Plaintiff and Class members.

## <u>COUNT II</u>
## GROSS NEGLIGENCE

73.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

74.    Defendants owed Plaintiff and Class members the duty to exercise reasonable diligence, care, and skill in recommending the Ameriprise Sweep Program.

75.    Defendants breached their duties by failing to act in the best interests of Plaintiff and Class members, including by not negotiating and paying the available reasonable interest rates on the cash balances in their clients' accounts; and by placing their

own interests ahead of Plaintiffs' and Class members' interests by securing increased net interest income at the expense of their clients.

76.     Defendants' conduct as alleged in this Complaint was grossly negligent because their self-serving conduct demonstrates a complete lack of care and reckless disregard for their clients' interests. Defendants' conduct also demonstrates an extreme departure from the ordinary standard of care.

77.     Defendants' gross negligence directly and proximately caused harm to Plaintiff and the Class members. As a result, Plaintiff and Class members suffered damages in an amount to be determined at trial.

**COUNT III**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

78.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

79.     The Broker Agreement, entered into by Defendants on the one hand and Plaintiff and Class members on the other, provides that Minnesota law applies to services offered by Defendants, including the Ameriprise Sweep Program.

80.     Under Minnesota common law, a covenant of good faith and fair dealing is implied into every contract.

81.     Plaintiff and Class members contracted with Defendants to provide them with financial and/or investment services pursuant to the Brokerage Agreement.  Under the Brokerage Agreement, Defendants were agents of Plaintiff and Class members and owed them fiduciary duties, including to act in their best interests. Defendants failed to obtain for Plaintiff and Class members higher and reasonable rates of return on their cash balances

and instead acted in Defendants' own interests. Moreover, under the Broker Agreement, as broker-dealers and pursuant to Reg. BI and 84 Fed. Reg. 134, 17 C.F.R. § 276, Defendants had a duty to act in the best interests of Plaintiff and Class members and not put their interests above Plaintiff and Class members.

82.     These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties (both explicit and implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the covenants that Defendants would act fairly and in good faith in carrying out their contractual obligations to provide Plaintiff and Class member with fair and reasonable rates of return on their cash sweep balances.

83.     Defendants breached these implied covenants of good faith and fair dealing by failing to provide Plaintiff and Class member with fair and reasonable rates of return on their cash sweep balances. Defendants, instead of providing fair and reasonable rates of return on their clients' cash sweep balances, provided far below market rates of return that their clients could have otherwise earned on their cash. Defendants acted dishonestly and failed to exercise and/or abused their discretion in selecting the banks which would hold Plaintiff and Class members' cash balances and in failing to negotiate reasonable rates of interest but instead negotiated higher rates of interest and fees for themselves.

84.     Plaintiff and Class members fulfilled all the terms and obligations of their contract, including paying for Defendants' services.

85. Defendants' failure to act in good faith in providing fair and reasonable rates of return on their customers' cash sweep balances denied Plaintiff and Class members the full benefit of their bargain. Plaintiff and Class members received a minimal return on their cash sweep balances that were less than what they could have otherwise earned and less than their reasonable expectations under their contract with Defendants.

86. As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and Class members sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

## COUNT IV
## BREACH OF CONTRACT

87. Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

88. Plaintiff and Class members entered into the Broker Agreement, whereby Defendants are obligated to provide Plaintiff and Class members with financial services, including a contractual obligation to negotiate for Plaintiff and Class members rates of return on their cash balances that are reasonable and to otherwise act in the best interest of the clients in the operation of the Ameriprise Sweep Program.

89. Pursuant to the Broker Agreement, Defendants were and continue to be contractually obligated to obtain for Plaintiff and Class members rates of return on their cash sweep balances that are reasonable and to otherwise act in the best interests of the clients in the operation of the Ameriprise Sweep Program.

90.     As alleged herein, the rates of return paid to Plaintiff and Class members on their cash sweep balances were not fair and reasonable, and neither were the increase interest payments and fees that Defendants extracted for themselves when negotiating with the affiliated banks. As a result, Defendants breached the contract with Plaintiff and Class members.

91.     Accordingly, Plaintiffs and Class members were harmed by Defendants' breach; and sustained damages in an amount to be determined at trial.

**COUNT V**
**UNJUST ENRICHMENT**

92.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

93.     Because of Defendants' wrongful conduct as alleged herein, Plaintiff and Class members received lower interest payments on their cash sweep balances than they would have in a reasonable and fair market.

94.     Because of Defendants' wrongful conduct as alleged herein, Defendants unjustly received a benefit at the expense of Plaintiff and Class members in the form of increased interest income that belonged to Plaintiff and Class members.

95.     It would be unjust and inequitable to allow Defendants to retain these wrongfully obtained benefits.

96.     Plaintiff and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class defined above, respectfully request that this Court enter:

(a) An order certifying this case as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiff as the Class representative, and appointing the undersigned as Class counsel;

(b) A judgment awarding Plaintiff and Class members appropriate monetary relief, including actual damages, equitable relief, restitution, and disgorgement;

(c) An order entering injunctive and declaratory relief as appropriate under the applicable law;

(d) An order awarding Plaintiff and the Class pre-judgment and/or post-judgment interest as prescribed by law;

(e) An order awarding reasonable attorneys' fees and costs as permitted by law; and

(f) All other and further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

Date:  August 21, 2024

/s/John G. Albanese
E. Michelle Drake, Bar No. 0387366
John G. Albanese, Bar No. 0395882
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470
emdrake@bm.net

jalbanese@bm.net

GIBBS LAW GROUP LLP
Rosemary M. Rivas*
Rosanne L. Mah*
Brian E. Johnson*
1111 Broadway, Suite 2100
Oakland, California 94607
(510) 350-9700 (tel.)
(510) 350-9701 (fax)
rmr@classlawgroup.com
rlm@classlawgroup.com
bej@classlawgroup.com
*pro hac vice forthcoming

*Attorneys for Plaintiff Mark Frey*